Argued and submitted February 17, 2021, reversed and remanded
August 31, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARK TANGUAY RAYMOND PILON,
*Defendant-Appellant.*

Clackamas County Circuit Court
18CR28900; A171010

516 P3d 1181

On the morning this criminal trial was set to begin, the state provided defendant with two previously undisclosed police reports, in violation of the discovery statutes. Defendant requested a continuance in order to review the reports and investigate the new information. The trial court denied the request for a continuance. Defendant challenges the trial court's ruling. *Held*: Because defendant was prejudiced by the state's violation of the discovery statutes, the trial court abused its discretion when it failed to impose any remedy for the discovery violation. The trial court had discretion to determine the appropriate remedy, but imposing no remedy was not within the range of options.

Reversed and remanded.

Richard Baldwin, Senior Judge.

Stephen A. Houze argued the cause and filed the briefs for appellant.

Dashiell L. Farewell, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before James, Presiding Judge, and Lagesen, Chief Judge, and Kamins, Judge.

JAMES, P. J.

Reversed and remanded.

## JAMES, P. J.

In Oregon, reciprocal criminal discovery is prescribed by statute. ORS 135.845 provides that "[t]he obligations to disclose shall be performed as soon as practicable following the filing of an indictment or information in the circuit court or the filing of a complaint or information charging a misdemeanor or violation of a city ordinance." For discovery that could "exculpate the defendant," or could "[n]egate or mitigate the defendant's guilt or punishment," or could "[i]mpeach a person the district attorney intends to call as a witness at the trial," the timeliness of disclosure is emphasized to be "without delay." ORS 135.815(2).[1] The legislature has provided a continuum of remedies for failing to comply with criminal discovery, ranging from the rather benign continuance, up to and including "refus[ing] to permit the witness to testify, or refus[ing] to receive in evidence the material not disclosed[.]" ORS 135.865.

In this case, the morning that trial was set to begin, February 12, 2019—285 days *after* arraignment on May 3, 2018—the prosecution provided defense counsel two police reports that had previously been undisclosed. After reviewing those reports, defense counsel indicated that he would need to conduct further investigation and asked for a continuance; the court declined. Defendant now appeals, arguing that the trial court abused its discretion in denying his continuance request. We agree and reverse and remand.[2]

### BACKGROUND

Although the issue on appeal is procedural, the import of the police reports disclosed on the morning of trial requires contextualization by reference to what was at issue at trial. For that reason, we state the facts of the encounter that gave rise to the charges.

Defendant and his wife K had been arguing throughout the afternoon and evening of April 28, 2018, and defendant

[1] In 2021, the Oregon legislature made some changes to the reciprocal discovery statutes not pertinent here. *See* Senate Bill (SB) 751 (2021) (effective Jan 1, 2022).

[2] In his supplemental brief, defendant also assigns error to the trial court instructing the jury on nonunanimous verdicts. Because this case is being reversed and remanded for a new trial, it is unnecessary to address that issue.

had also been drinking. After going out to eat and drink more, defendant returned home around 1:00 a.m. on April 29, 2018. Defendant used his pocketknife to destroy some of K's belongings and craft projects. When K tried to stop him, there was a physical altercation, with accounts varying between the two parties as to the extent of the physical involvement. K then left the home and called 9-1-1 while hiding in the neighbor's yard. The audio of her 9-1-1 call was played at trial and included her statements that defendant had assaulted her, that the children were still in the home, and that defendant had access to firearms.

Officers arrived on the scene and staged away from the house. They testified that they did not approach with lights and sirens due to the nature of the incident and their desire not to escalate the situation. One officer spoke to defendant via K's phone, instructing him to exit the home to speak to the officers. Defendant testified that he did not at that point think the police were actually present, and that he did not know who the man using his wife's phone was. Defendant exited the home a couple of times and looked around, at one point getting a firearm from his truck. He subsequently exited the home with the firearm and briefly pointed it in the direction of the police, before surrendering and being taken into custody.

At the trial, K and multiple law enforcement officers testified to their observations of the evening, giving varying accounts of the facts and how far they were from defendant and what they were able to see during the confrontation. The defense strategy relied largely on discrediting K, challenging the police officers' differing accounts of the incident, pointing out differences in their claimed distance from defendant, and questioning whether they could actually see what they claimed to see. Additionally, defense counsel sought to establish that defendant was acting in self-defense and did not point his weapon at the officers—a strategy that was dependent on the various officers' accounts of their locations and distances.

On the morning the trial was set to begin, the prosecutor provided the defense with two police reports from officers who had responded on the night in question, Deputy

Belmont and Sergeant Zaitz. The parties had a conversation with the court in chambers, off the record, regarding the reports. On the record, defense counsel made a motion for a continuance, arguing that the reports impacted the defense strategy relating to the credibility of the officers and the victim and warranted further investigation of the scene. We quote the discussion at length, as the arguments presented and the court's rationale factor into our analysis.

> "[DEFENSE COUNSEL]:   So Judge, as I was saying, when I arrived this morning about 9:00 a.m., I received a report from the State from an Officer Belmont. Shortly thereafter, maybe 10, 15 minutes later, I received a second report from an Officer Zaitz. Both of these, Judge, I was surprised to get these at the very last minute. I had actually sent an email to the State asking hey, is there any body cam? Is there any dash cam, anything like that and the State advised no, I told you back on June 20th. I said okay. I don't think that the State had any idea that these reports existed at all. This is rather common.
>
> "Judge, I wouldn't normally ask for a continuance if these reports simply stated I received a call, I went to the scene, and this is kind of procedurally what I did. However, Judge, both of these police reports substantively affect the charges, particularly Officer Belmont's report addresses some victim statements. It also affects the menacing charge, which we prepared for based on the previous police reports which didn't really support a menacing charge, which now that's [changed]. Then in regards to the assault 4, it changes the assault 4. Then also Belmont's report affects the unauthorized use of a weapon—or unlawful use of a weapon.
>
> "In regards to Zaitz's report, Zaitz's report also affects the unlawful use of a weapon, which is the count that involves law enforcement here. These are significant charges.
>
> "I've spoken with my investigator, who is also my use of force expert witness if I—if we decide to call him and he's advised that based [on] these reports, he would want to go back out to the area. He would want to get some measurements.
>
> "*****

"*** [W]e have law enforcement at stages around the house, at very far distances, varying distances, and continued varying distances based on the new reports that we received today.

"There's some questions that were raised by our investigator in regards to potential measurements. ***

"*****

"*** There's some question in regards to lighting in regards to what some of the officers say.

"So Judge, if this were a simple DUI case, if these reports that were simply procedural, I responded to a call, this is what I saw, that would be one thing. However, these are substantial charges. *** I think that the Court requiring the Defendant to go forward with the introduction of these new reports prejudices his ability to put together a defense to analyze these to do what is necessary in regard to putting together a proper defense.

"*****

"*** [I]n regard to what the State has read out of page 20 of the initial discovery that we received in a timely fashion, that is contradicted—well, I believe it's contradicted, I would need to spend some time to really break it down, but in the reports from Officer Belmont, *** [h]e states in page 2, beginning at the second full paragraph: 'While Sergeant Edwards was speaking to Mrs. Pilon,' Mrs. Pilon is the victim in this case, the alleged victim, '[defendant] called her cellphone. Sergeant Edwards spoke to [defendant] and Mrs. Pilon's cellphone. See Sergeant Edwards' report for further details.'

"Then it goes on to say,

"'We walked back to the corner of Renee Way and Blanchet Drive with some other units on the scene. Sergeant Edwards spoke to [defendant] again on the cellphone. Sergeant Edwards asked me to get permission from Mrs. Pilon to look through her text messages. I went back to Mrs. Pilon and she told me her cellphone passcode. Mrs. Pilon showed me the text conversation.'

"So then it goes on that Deputy Belmont takes a phone call from [defendant]. Now, that is reflected in this original report, but you can't tell where the two officers are vis-a-vis

in regard to the position that they state that [defendant] is at.

"So Judge, I just, I believe that that in and of itself requires additional analysis of these reports and it's not something that we can just go across the street and spend an hour on. I want to compare this, and contrast this, to the other police reports written by the other officers, and then compare it to—we do have a map and a diagram and track all that.

"So I mean, I understand the State's position, but I believe that not having that ability, getting that drop on you the morning of trial, is something that a few hours or even the course of a day is not enough to cure. I believe that a continuance, and Judge, we—I mean, we want to try this case as well. A short continuance would be just fine, but a continuance nonetheless is what is required here to remove any potential prejudice to [defendant].

"Additionally, Judge, and I know the Court is always concerned about that, and that is the inconvenience of the witnesses. The only civilian witness that I'm aware of is the—is Mrs. Pilon. Mrs. Pilon lives here locally. It's—she—my understanding is that she may run a daycare, but based on some of the information and beliefs that I have, I don't think that this is—I mean, obviously, coming to court is an issue, but I don't think that this is going to have any kind of economic disadvantage for her.

"So again, Judge, I would ask for a continuance based on those points.

"[THE STATE]: And Your Honor, I'll just note for the record that [defense counsel] did move to continue this case and it was denied by the presiding previously.

"THE COURT: Okay. Based on the record, the Court does not find good cause for a continuance. I do think that the Defense can respond to these differences in the report effectively during trial without significant prejudice to the Defendant. As we discussed this in chambers, I think that some of these changes in the report are actually more favorable to the Defendant and based on the age of the case.

"My understanding also is that the State has eight witnesses involved; is that right?

"[THE STATE]: Yes, sir.

"THE COURT:   Okay. And so based on those factors and the record, the Court denies the motion."

The trial proceeded over the following four days, and defendant was convicted on five of the charged counts.

We review a trial court's denial of a motion for a continuance for an abuse of discretion. *State v. Sassarini*, 300 Or App 106, 117, 452 P3d 457 (2019). "Discretion" refers to the authority of a trial court to choose among several legally correct outcomes. *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000) ("If the trial court's decision was within the range of legally correct discretionary choices and produced a permissible, legally correct outcome, then the trial court did not abuse its discretion."). Accordingly, a first step in analyzing the exercise of discretion is to determine the boundaries that define the range of permissible discretion. A continuance motion made in the general course of trial scheduling is afforded wide discretion. *State v. Kindler*, 277 Or App 242, 250, 370 P3d 909 (2016). A continuance requested as a remedy for a discovery violation, however, operates within the boundaries of the discretion afforded by the discovery statutes. Accordingly, we first address whether the continuance motion here was made generally, or under the ambit of the discovery statutes.

The two reports from Belmont and Zaitz, both of whom testified in the trial, are clearly discoverable under ORS 135.815(1)(a). They should have been disclosed to defendant "as soon as practicable." ORS 135.845. The record contains little discussion as to the circumstances surrounding the last-minute disclosure. Defense counsel stated his belief that the prosecutor herself did not physically have the reports earlier, and we agree. However, it is well-established that material in the control of the police tasked with responding to, or investigating, an incident is considered to be in the control of the prosecution for purposes of the discovery statutes. *State ex rel Wilson v. Thomas*, 74 Or App 137, 141, 700 P2d 1045, *rev den*, 300 Or 64 (1985) ("[T]he police are an arm of the prosecution for the purposes of the discovery statute."); *State v. Warren*, 304 Or 428, 433 n 5, 746 P2d 711 (1987) ("We agree with the Court of Appeals that, with regard to investigation of crime, '[t]he police are an arm of

the prosecution for the purposes of the discovery statute. ***'"); *State v. Daniels*, 261 Or App 519, 528, 323 P3d 491, *rev den*, 355 Or 668 (2014) ("*Warren* stands for the proposition that, if an entity is required to disclose records to the district attorney or to police, the prosecution has control over the records and, accordingly, must disclose to a defendant any of those records that fall within ORS 135.815."); *cf. State ex rel Glode v. Branford*, 149 Or App 562, 568-69, 945 P2d 1058 (1997), *rev den*, 326 Or 389 (1998) (holding that the Lincoln County District Attorney did not have control of records held by police agencies in other counties and therefore could not be compelled to provide discovery of those records); *State v. Wixom*, 275 Or App 824, 835, 366 P3d 353 (2015), *rev den*, 359 Or 166 (2016) (prosecutor did not have control over records concerning DHS's involvement with the victim and her placement in foster care as a result of child dependency proceedings).

While it is unknown when precisely the reports were created or available to the prosecutor, testimony during the trial indicates Zaitz's report included a step-by-step narrative of what he observed, and Belmont testified that he completed and turned over his report no later than the day after the incident. Based on this testimony, the record here establishes that these reports were not created the night before trial, thereby rendering the morning of trial disclosure "as soon as practicable." Instead, the record shows that the reports were created contemporaneously with, or shortly after, the incident. Whether those records were created by the police and not turned over to the prosecutor, or were turned over and misplaced, doesn't matter. Once those reports were created, the state had them in its possession, and they were subject to discovery.[3]

---

[3] Without copies of the reports, we cannot conclusively find that they would qualify as exculpatory or that they would necessarily impeach one or more of the state's witnesses, despite the trial court's statement that "some of these changes in the report are actually more favorable to the Defendant." We therefore do not find that they were subject to disclosure under ORS 135.815(1)(g). However, the designation would not make a difference in our current analysis. In the interests of completion, however, we note that discovery of evidence under ORS 135.815(1)(g) is not limited solely to information reduced to writing. SB 751 (2021) clarified that discovery "[s]hall occur regardless of whether the material or information is recorded or in writing." ORS 135.815(2)(a)(A) (2022).

A point bears emphasis—we perceive no bad faith on this record, either by police or the prosecutor's office. The discovery statutes, and accompanying remedies, are not dependent on blame or bad faith. Oregon's criminal reciprocal discovery statutes operate in the very hectic world of criminal trial practice. Prosecutor and defense offices are busy places, with many moving parts and personnel, and sometimes things get overlooked, entirely inadvertently. This is compounded by the hectic realities involved in law enforcement. Good people, doing their best in a stressful system, can fail to disclose information that should have been disclosed. It is entirely understandable, but no less a discovery violation.

Here, the request for a continuance came after a chambers conference, which itself was prompted by morning of trial discovery. On appeal, the state does not argue in its briefing that there was no discovery violation, but the state also did not explicitly admit at oral argument that a violation had occurred. Looking to the trial however, all parties appeared to operate under the presumption that a discovery violation had occurred. On this record, especially given the testimony of the officers concerning when the reports were authored, we conclude that defendant's request for continuance was not made generally but was made in the context of the discovery statutes, as a requested remedy for a perceived discovery violation.

Having determined that the continuance request was made as a requested discovery remedy, we evaluate the trial court's exercise of discretion within that statutory framework. ORS 135.865 states:

> "Upon being apprised of any breach of the duty imposed by [the discovery statutes], the court may order the violating party to permit inspection of the material, or grant a continuance, or refuse to permit the witness to testify, or refuse to receive in evidence the material not disclosed, or enter such other order as it considers appropriate."

This statute clearly establishes a wide range of discretion on the part of a trial court in deciding how to address discovery violations. But in exercising its discretion, the trial court

must impose a remedy that is in furtherance of the purpose of the discovery rules.

Oregon's reciprocal criminal discovery statutes were enacted in 1973 in the wake of *Brady v. Maryland*, 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963). They were modeled off the American Bar Association *Standards Relating to Discovery and Procedure Before Trial*, (1970) (ABA Standards), Standard 4.7, and are designed to support constitutional rights:

> "As stated, the fundamental right that the compulsory process clause aims to protect is 'the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.' *** The ultimate aim of the reciprocal discovery statutes is largely congruent with that goal in the sense that such statutes insure that both sides have access to all the facts so that the jury can best determine where the truth lies."

*State v. Mai*, 294 Or 269, 274, 656 P2d 315 (1982) (quoting *Washington v. Texas*, 388 US 14, 19, 87 S Ct 1920, 18 L Ed 2d 1019 (1967)); *see also State v. King*, 30 Or App 223, 226, 566 P2d 1204 (1977), *rev den*, 281 Or 1 (1978) (discussing history of discovery); *State v. Dyson*, 292 Or 26, 636 P2d 961 (1981) (same). Chief among the purposes of the rules is "to assure to both the state and the defendant the opportunity, in advance of trial, to be provided with the information required by these statutes so as to enable each party to prepare adequately for trial and to prevent 'surprise' at the time of trial." *Dyson*, 292 Or at 35. The Supreme Court has also noted the importance of "efficient judicial administration, i.e., to avoid unnecessary trials, to expedite trials and to prevent the expense and delay of continuances when either party claims to be unprepared to go to trial because of failure by the other party to comply with these discovery statutes." *Id.* at 36.

The first in the range of remedies provided by ORS 135.865—an order "to permit inspection of the material"—is intended for pretrial discovery disputes. It applies to situations where one party has a document that they are refusing to disclose, that the other side believes is discoverable.

Obviously, an order to disclose does nothing to further the purposes of the discovery rules when the item has already been disclosed. In such instances, the arguments turn to the harm of surprise and delay that may have already occurred at that point. *State v. Harshman*, 61 Or App 711, 716, 658 P2d 1173 (1983) ("The effective administration of justice requires that discoverable evidence be provided much sooner than 'moments' before trial."). Accordingly, for morning of trial disclosures, ORS 135.865 contemplates other remedies, ranging from continuance, refusing to permit the witness to testify, or evidence exclusion, or "such other order" as the court "considers appropriate." Choosing among those remedies requires an inquiry into prejudice.

In *State v. Wolfe*, 273 Or 518, 542 P2d 482 (1975), the state objected to the defendant calling two witnesses whose names had not been disclosed to the state in discovery. *Id.* at 520-21. The trial court excluded the witnesses, and this court upheld that decision. *Id.* at 519. On appeal to the Supreme Court, the defendant argued that the trial court erred in imposing the extreme sanction of excluding one of the witnesses because the state had made no showing that it would have been prejudiced by the trial court permitting the defendant to call her. *Id.* at 523-24. The Supreme Court affirmed the Court of Appeals ruling, holding:

> "The presence or absence of prejudice is a most important factor to be considered by the trial court in exercising the discretion conferred upon it by ORS 135.865 in the choice of sanctions, particularly in imposing the extreme sanction of refusing to receive in evidence the material not disclosed. The terms of the statute, however, do not appear to make the presence or absence of prejudice a necessary factor in the exercise of the discretion conferred by the statute in the choice of any of the sanctions to be imposed by its terms."

*Id.* at 524-25.

Two years later, we addressed prejudice and remedies in *King*. In that case, the state had failed to disclose two witnesses it intended to call. *King*, 30 Or App at 225. The trial court allowed the state to call the witnesses, over defendant's objection, and defendant appealed. *Id.* We reviewed the extensive history of Oregon appellate courts wrestling

with what remedy to impose for breaches of discovery rules, noting that "[i]n some cases involving breach of the discovery statutes, we have affirmed suppression and exclusion of nondisclosed evidence. In other cases involving similar breaches of the discovery statutes, we have affirmed trial courts' failure to impose any sanction." *Id.* at 227 (citations omitted). We conducted a thorough review of the legislative history relating to the discovery statutes and concluded:

> "[T]he various draftsmen intended: (1) trial courts would have discretion and could use ingenuity to fashion remedies for violation of the discovery statutes, subject to appellate court supervision; (2) that the extent of prejudice caused by nondisclosure would be relevant to the formulation of a remedy; (3) generally, an order to disclose and a reasonable continuance would be the most appropriate remedy in the majority of situations; and (4) that the sanction of ruling nondisclosed evidence excluded from the trial should be used only in the most extreme situations."

*Id.* at 228. We then analyzed the issue of prejudice, and concluded:

> "We hold that a party aggrieved by a violation of the criminal discovery statutes who establishes substantial prejudice to the preparation of his case for trial is entitled to some remedy for the other party's breach of statutory duty. We hold that the selection of a sanction to be imposed upon the offending party is limited by the guidelines noted above. And conversely, we hold that no sanction for violation of the discovery statutes is warranted when the violation causes no prejudice in the preparation of the case for trial."

*Id.* at 230.

In *King*, we recognized that our interpretation could potentially be foreclosed by the holding in *Wolfe* that the terms of ORS 135.862 "'do not appear to make the presence or absence of prejudice a necessary factor in the exercise of the discretion conferred by the statute in the choice of any of the sanctions to be imposed by its terms.'" *Id.* at 230-31 (quoting *Wolfe*, 273 Or at 525). However, we acknowledged that the Supreme Court was aware of the same legislative history when it issued *Wolfe*, and we concluded:

> "[W]e cannot believe the Supreme Court intended to hold
> that the trial court's discretion was so broad as to allow
> imposition of no sanction for a highly prejudicial violation
> of the discovery statutes or so broad as to allow imposition
> of an extreme sanction for a technical, nonprejudicial viola-
> tion of the discovery statutes."

*King*, 30 Or App at 231.

This interpretation remained the leading statement
on prejudice and remedies for several years, with prejudice
being a prerequisite for the imposition of extreme remedies.
*See, e.g.*, *State v. Mead*, 44 Or App 53, 56-57, 604 P2d 1283
(1980) ("If the court finds that the state did not comply [with
the discovery statutes], it will then determine if the defen-
dant was prejudiced by the violation. If it is found that defen-
dant was, in fact, prejudiced, then it will become necessary
to determine the degree of prejudice and an appropriate
remedy."); *State v. Campbell*, 44 Or App 3, 6, 604 P2d 1266,
*rev den*, 289 Or 71 (1980) ("[E]xclusion of evidence is appro-
priate only where the violation substantially prejudices the
other party in preparing its case for trial and no less severe
sanction will obviate the prejudice.").

Eventually the issue was once again taken up by the
Supreme Court in *Dyson*, where the court sought to resolve
the apparently contrary holdings between *Wolfe* and our
holdings in *King* and the cases that applied it. *Dyson*, 292
Or at 28. In *Dyson*, the state had failed to provide the defen-
dant with witness names and written statements until four
days prior to the trial. The trial court excluded all of the wit-
nesses. *Id.* at 28-30. We reversed, holding that under *King*
and *Campbell*, exclusion was only appropriate where the dis-
covery violations substantially prejudiced the other party in
preparing its case, and no less severe sanction would obviate
the prejudice. *Id.* at 28 (citing *State v. Dyson*, 52 Or App 833,
836, 629 P2d 887 (1981)). The Supreme Court reviewed its
prior holding in *Wolfe*, recounted our holding in *King* and
its subsequent application, and re-examined the legislative
history of the discovery statutes. *Dyson*, 292 Or at 30-34.

> "From this examination, we find no indication of a legisla-
> tive intent to limit the imposition of the sanctions of ORS
> 135.865 to cases in which noncompliance with discovery

requirements is shown to cause prejudice or, more specifi-
cally, to require a showing that such a violation has caused
'substantial prejudice' to the other party before a court may
exclude undisclosed evidence."

*Id.* at 34. The court reaffirmed its holding in *Wolfe* and
found that we had misconstrued that holding in *King* and
*Campbell* when we found that a showing of prejudice was
required before exclusion could be utilized as a remedy for
discovery violations. *Id.* at 35.

While the Supreme Court's analysis in *Dyson*
rejected the holding in *King* that no remedy is warranted in
the absence of prejudice, it did not disturb *King*'s holding that
a party prejudiced by a violation of the discovery statutes "is
entitled to *some* remedy." *King*, 30 Or App at 230 (empha-
sis added). *Dyson* established that the most serious remedy
of exclusion may be imposed in any situation, regardless of
whether a party was prejudiced or not. But in the *presence*
of a prejudicial discovery violation, the permissible range of
discretion does not include imposing *no* remedy. Such a hold-
ing would remove all meaning and strength from the discov-
ery statutes. As we have discussed in past considerations
of the history and purpose of the discovery rules, the com-
mentary to the American Bar Association Standards, from
which ORS 135.865 was derived, states "'[R]ights and duties
are ephemeral indeed without remedies. Thus, by this stan-
dard, the Committee intends to emphasize that discovery
rules must be enforced.'" *King*, 30 Or App at 227 (quoting
ABA Standards at 107).

In assessing the proper remedy for a discovery vio-
lation then, prejudice becomes the threshold issue. *Wolfe*,
273 Or at 524-25. The presence, or absence, of prejudice will
determine whether no remedy is a permissible option in the
range of discretion. The existence of prejudice, while depen-
dent on predicate facts to which we will defer, is a question
of law, reviewed for errors of law. *Ashley v. Hoyt*, 139 Or App
385, 395 n 8, 912 P2d 393 (1996).

In *King*, we noted that the prejudice inquiry must
focus on the extent of surprise and the impact of the viola-
tion on trial preparation:

"Every time there is a failure to disclose evidence subject to pretrial discovery, there will be some surprise—and thus arguably some prejudice—at trial. However, the general purpose of the Oregon criminal discovery statutes is to 'minimize surprise.' \*\*\* The operative word is 'minimize,' not 'eliminate.' Thus, the prejudice inquiry must first focus on the extent of surprise."

*King*, 30 Or App at 228-29. We then examined the second aspect of the prejudice inquiry, namely: "What would the party to whom disclosure should have been made reasonably have done differently to prepare for trial had disclosure occurred?" *Id.* at 229. In that case, we looked to the record and found no claim of actual surprise and that the record contained no answer to the question of what the defendant would have done differently to prepare for trial had the disclosure been made; thus, the defendant had failed to claim or show any prejudice. *Id.* at 229-30. That approach to assessing the presence of prejudice has routinely been applied. *Harshman*, 61 Or App at 716 ("Other crimes evidence carries with it the hazard of unfair prejudice to the defendant. The failure to timely disclose the discoverable evidence thwarts the purpose of discovery. Surprise looms large, and defense counsel is denied the opportunity to meet the evidence. The denial of a continuance to prepare for such grave evidence was actual prejudice."); *City of Portland v. Peterson*, 55 Or App 537, 541-42, 639 P2d 638 (1982) (noting that an officer's statements that were the subject of late disclosure did not impact the defendant's trial strategy and the officer's participation in the incident was insignificant); *State v. Sarratt*, 52 Or App 443, 448 & n 2, 628 P2d 752 (1981) (noting the *King* two-pronged test and its application in other cases).

In this case, the trial court made no explicit credibility findings, and nothing indicates that the court found counsel not to be credible.[4] Additionally, although the

_____

[4] We note that the prosecutor reminded the court that defense counsel had sought, and was denied, a continuance about a week earlier. Additionally, the prosecutor, quite correctly, pointed out to the court that defense counsel had submitted a witness list just the night before trial—itself a violation of the *reciprocal* rules of discovery, specifically ORS 135.835(1). We understand the prosecutor to have made that observation as a way of indicating that defense counsel would not have altered their trial strategy had they had the reports earlier, because their

prosecution tacitly acknowledged that the reports could be a basis for a different line of cross-examination of the victim or officers than was originally available prior to the disclosure, the prosecutor argued that many aspects of the newly disclosed report were cumulative. Again, however, the trial court made no findings to that effect. Instead, the trial court found that the material was nonprejudicial because it believed that "the Defense can respond to these differences in the report effectively during trial * * *." Further, the court said, "I think that some of these changes in the report are actually more favorable to the Defendant * * *."

An assessment of prejudice, however, is not an exercise in substituting a court's trial strategy or tactics for counsel's. In our adversarial system, judges are not in the best position to make judgments regarding trial strategy, particularly when it comes to the import of new evidence. *See Rosenberg v. United States*, 360 US 367, 371, 79 S Ct 1231, 3 L Ed 2d 1304 (1959) ("An appellate court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled."); *see Dennis v. United States*, 384 US 855, 875, 86 S Ct 1840, 16 L Ed 2d 973 (1966) ("The determination of what may be useful to the defense can properly and effectively be made only by an advocate."); *Alderman v. United States*, 394 US 165, 182, 89 S Ct 961, 22 L Ed 2d 176 (1969) (noting that seemingly innocent remarks and other facts "may have special significance to one who knows the more intimate facts of an accused's life," and concluding that the task is too complex to rely "wholly on the *in camera* judgment of the trial court to identify those records which many have contributed to the [party's] case"); *United States v. Jonas*, 540 F2d 566, 569 n 4 (7th Cir 1976) (noting that "[t]he assumption that a court can judge what is or what is not useful to a defense attorney" is unsupported); *Little v. Turner*, 402 F2d 495, 499 (10th Cir 1968) (citing *Dennis* with approval); *Jones v. State of Maryland*, 297 Md 7, 15-16, 464 A2d 977, 981 (App Ct Md 1983) (citing *Dennis* with approval); *Thorne v. State of Indiana*, 429 NE2d 644,

---

defense expert was apparently retained within the last day, based off the timing of the disclosure of the witness list. Neither of those rationales were taken up by the trial court in the form of fact or credibility findings, however.

646 (Ind 1981) (citing *Dennis* with approval); *State of New Mexico v. Orona*, 92 NM 450, 452, 589 P2d 1041, 1043 (1979) (citing *Dennis* in finding a trial court's order may have made a potential avenue of defense unavailable to the defendant); *State of Wisconsin v. Perry*, 128 Wis 2d 297, 300 n 1, 381 NW2d 609, 610 n 1 (Ct App 1985) (citing *Dennis* for the proposition that the United States Supreme Court had refuted "the assumption that a court can judge what is or what is not useful to a defense attorney").

Here, unlike in *King*, the factual record shows that defense counsel was surprised by the reports and indicated the reports substantively affected the charges. Counsel reported to the court that he needed additional time to review the reports and compare and contrast them to the other reports already in discovery, in addition to going back to the scene to take measurements. He specifically noted that one of the reports "affects the menacing charge, *which we prepared for based on the previous police reports which didn't really support a menacing charge*." (Emphasis added.) He further indicated that it appeared one of the new reports contradicted other information provided, but that he would need to spend some time to break it down and analyze the new information. With no factual findings to the contrary, we have no reason to doubt defense counsel's detailed assertions that the reports required more investigation and could potentially change his trial strategy.[5] *See Dennis*, 384 US at 874-75 ("Nor is it realistic to assume that the * * * court's judgment as to the utility of material for impeachment or other legitimate purposes, however conscientiously made, would exhaust the possibilities. In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate."). As such, the record here establishes prejudice.

On this record, having found defendant was prejudiced by the state's discovery violation, we conclude that the trial court abused its discretion in failing to impose any

_____

[5] To some extent we are limited in our review of the facts, as the reports in question do not appear in the record before us and it appears that much of the discussion of the contents of the reports occurred off the record in chambers.

remedy. By denying defendant's request for the bare minimum of a continuance to be adequately prepared, or any other remedy in furtherance of the purposes of fairness, adequate preparation, and efficient judicial administration, the trial court effectively endorsed the state's discovery violation. Accordingly, we reverse and remand for a new trial.

Our holding today does not reduce a trial court's discretion to determine the appropriate remedy, other than to clarify that imposing *no remedy* is not within the range of options when a party has been prejudiced by a violation of the discovery statutes. *Cf. State v. Pyle*, 321 Or App 149, 156, 516 P3d 273 (2022) ("How best to enforce the subpoena to ensure the presentation of evidence is committed to the sound discretion of the trial court, but it cannot do *nothing*." (Emphasis in original.)). The amount of prejudice created by a violation, the reasons disclosure was not made, the feasibility of rectifying the prejudice, and other relevant circumstances will all factor into the court's exercise of discretion as to the type of remedy selected, or, in the case of a continuance, the amount of additional time granted.

Reversed and remanded.